UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
JAMES ROBINSON,

        **MEMORANDUM & ORDER**
    Petitioner,      06-CV-1081 (NGG)
 - against -

ROBERT ERCOLE, Superintendent,
Green Haven Correctional Facility,

    Respondent.
------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

  Petitioner James Robinson ("Petitioner" or "Robinson")[1] seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He is currently incarcerated in Green Haven Correctional Facility, serving a sentence of twenty-five years to life. In his petition, filed on March 10, 2006, Robinson challenges the constitutionality of the judgment of conviction for Murder in the Second Degree (N.Y. Penal Law § 125.5(1)) entered against him in New York State Supreme Court, Kings County. For the reasons set forth below, Robinson's petition for a writ of habeas corpus is denied.

**I. Background**

  *A. Factual Background and Trial*

  On the night of February 22, 2000, at approximately midnight, several individuals, including Robinson, set out to avenge the death of their friend Lenny Gibbons ("Gibbons"). Gibbons had been killed in a gang murder two days earlier. (Perez T. at 233.) Sometime after midnight, Carlos Perez, Christopher Foye ("Foye"), Ricardo Regis ("Regis"), and Robinson

---

[1] Robinson was also referred to as "Rudolph Robinson" and "Rue Robinson" throughout the state court proceedings.

1

entered an automobile driven by Robinson and began searching the neighborhood of Bushwick, Brooklyn for the individuals they believed responsible for Gibbons's death. (Id. at 276-78; Regis T. at 292.) At some point after driving around the neighborhood, Carlos Perez and Foye argued, and all four men exited the vehicle. (Regis T. at 293-94.) While the men were standing outside the car, Robinson shot and killed Carlos Perez. (Id. at 294.) Moments later, witnesses saw Robinson drive away from the scene. (McDade T. at 51.) Foye and Regis remained behind with Carlos Perez's body until the police arrived at the scene. (Id. at 50.)

At trial, the prosecution presented testimony from several eye-witnesses including Taesha McDade ("McDade"), a high school student who observed the shooting from the stoop of a nearby apartment building. (Id. at 48-49.) The prosecution also called Regis and Foye, the other two men alleged to have been present in the car on the night of the shooting, as witnesses. Foye refused to answer questions about the crime, stating that he did not remember anything that happened on that night (Foye T. at 216-19), that he did not remember testifying in the grand jury (id. at 219), and that he did not want to testify at trial (id. at 217). Lawrence Perez, the victim's younger brother, testified about the events preceding and following the shooting. (Lawrence Perez T. at 231-47.) In addition to these witnesses, New York City Police Officers Joseph Mangiaracina ("Officer Mangiaracina") and James Ainsle ("Officer Ainsle"), New York City Police Detectives Joseph Ramirez ("Detective Ramirez"), William Ponzio ("Detective Ponzio"), and Joseph Noya ("Detective Noya"), New York City Fire Department Paramedic Stephen Hess ("Hess"), and a medical examiner, Dr. Frede Frederic ("Dr. Frederic"), testified at trial.

      i.      Testimony of Taesha McDade

McDade, a high school student at the time of the shooting, testified that, on February 22,

2000, she finished her work shift at Dunkin Donuts at approximately 12:15 a.m. and walked over to visit her boyfriend at 26 Weirfield Street in Brooklyn. (McDade T. at 48.) As she stood on the stoop waiting to be let inside his apartment building, McDade witnessed a gold-colored car stop down the street five houses away from where she was standing. (Id.) She watched the driver get out of the car and say to another individual in the car, "Get out the car, son. Get out the car." (Id. at 59.) The passenger seated in the right rear seat got out of the car and walked around to the back of the vehicle, the side closest to where McDade was standing. (Id. at 59-60.) As the driver and that passenger continued arguing, the two remaining passengers got out of the car and tried to restrain the first two men from physically fighting. (Id. 61-62.)

McDade could not describe the men's physical appearances and was not asked if she could identify Robinson. (Id. at 63.) However, she did testify about where the men had been seated in the car and about what she saw after they got out of the car. (Id. at 61-63.) McDade testified that the men were loud and that they were "very upset." (Id. at 49.) McDade further stated that, while all four men stood behind the car, she saw the driver pull out a gun and shoot the passenger who had been in the right, rear seat – "the one he was arguing with" – approximately five or six times. (Id. at 50.) She testified that the driver of the car then "jumped in the car and just screeched off" while the other passengers remained with the victim. (Id.) After witnessing the shooting, McDade went inside her boyfriend's apartment, but she did not call the police because she feared getting involved. (Id. at 53.)

    ii.  Testimony of Lawrence Perez

Lawrence Perez, the younger brother of victim Carlos Perez, testified that, prior to the shooting, he and his brother were at their house with a group of friends, including Regis and

3

Foye, and they were all "feeling down because our friend just had gotten murdered." (Lawrence Perez T. at 231.) Foye was angry that a friend of theirs, whom Lawrence Perez identified as Gibbons, had just been killed and that "nobody [was] doing nothing" about it. (Id. at 232.) After about half an hour of conversation, Lawrence Perez, Carlos Perez, Foye, Regis, and another man who was identified only as Jason, decided that they wanted to retaliate against the individuals who killed Gibbons. (Id. at 233.) Lawrence Perez testified that he, Carlos Perez, Foye, Regis, and Jason began walking towards Weirfield Street in Brooklyn but later decided to call a taxi. (Id. at 235.) As they were waiting for a taxi, however, Robinson pulled up in what Lawrence Perez described as a silver or gray Lincoln Continental. (Id. at 237.) Lawrence Perez testified that all of the men went back to Jason's house for about fifteen minutes before Carlos Perez, Foye, Regis, and Robinson got back into the car, with Robinson again driving. (Id. at 239.) As Lawrence Perez approached the car to join the group, Carlos Perez instructed him to stay home and wait for him to call. (Id. at 239-40.)

Lawrence Perez also testified that, when the men left Jason's house, "[t]o my knowledge, I kn[e]w they had guns because they were going to retaliate." (Id. at 248-49.) However, he did not recall actually seeing any guns. (Id.) The next contact that Lawrence Perez had with the group of men was when Regis came "running down the block [to tell him] that Carlos just had got shot." (Id. at 241.)

Lawrence Perez testified that, after Regis told him about the shooting, he went with Regis to the hospital, but his brother had died by the time they arrived. (Id. at 242.) On the night of the crime, neither Regis nor Foye told Lawrence Perez that they had seen the shooting, and only two days later did they tell Lawrence Perez that they, in fact, had seen what happened. (Id. at 268-

4

69.) Although Lawrence Perez recalled seeing both Foye and Regis in the days following the shooting, he did not recall seeing Robinson at any time during that same week. (Id. at 247-48.) Approximately a week and a half after his brother's death, Lawrence Perez moved to another state. (Id. at 248.)

         iii.       Testimony of Ricardo Regis

Regis had been friends with Carlos Perez, Lawrence Perez, and Foye for almost twelve years. (Regis T. at 313.) He had known Robinson for approximately two years. (Id.) Regis testified that he saw Robinson shoot Carlos Perez. (Id. at 294.) Regis testified that, prior to the shooting, he got into the car with Foye, Robinson and Carlos Perez. (Id. at 292.) Shortly after getting into the car, Regis witnessed an argument erupt between Foye and Carlos Perez regarding Gibbons's death two days earlier. (Id. at 293.) Regis testified that he, Foye, and Carlos Perez were questioning Robinson as to whether Robinson knew "the guys that killed Lenny" and that, eventually, Robinson acknowledged that he did know them. (Id. at 299.)

Regis testified that, at some point after the argument escalated, all of the men got out of the car, and Regis and Robinson tried to prevent Foye and Carlos Perez from fighting. (Id. at 294). While Regis was trying to restrain Foye, Regis heard gunshots on the other side of the car and saw Robinson shooting Carlos Perez. (Id.) Regis testified that, after the shooting, Robinson drove away but that Regis and Foye remained with Carlos Perez until the police arrived. (Id. at 294-95.) Afterwards, Regis left the scene to find Lawrence. (Id. at 311.)

         iv.       Testimony of Detective William Ponzio

Detective Ponzio was assigned to investigate the shooting. (Detective Ponzio T. at 134.) He testified that he arrived on the scene of the crime on February 22, 2000 after Carlos Perez had

5

already been taken to the hospital. (Id.) Over the next several days, Detective Ponzio canvassed the neighborhood looking for potential witnesses. (Id. at 135.) Detective Ponzio testified that, on February 24, 2000, Foye and Regis individually came to his precinct station to speak with him about the shooting, possibly in response to messages Detective Ponzio had left with members of their friends and family. (Id. at 136-37.) On February 25, 2000, McDade also came to the precinct station to speak with him about what she had witnessed on the night of February 22, 2000. (Id. at 137.)

Detective Ponzio testified that, from February 25, 2000 through April 2000, he attempted to locate Robinson by canvassing Robinson's neighborhood and by doing "computer checks." (Id. at 138.) He did not specify what he meant by the term "computer checks." (Id.) He also testified that, on June 29, 2000, after hearing that Robinson might be in Florida, he spoke with Detective Dixon, who was there. (Id. at 139.) Finally, Detective Ponzio testified that, on July 15, 2000, he traveled to Florida and arrested Robinson. (Id.)

    v.  Testimony of Detective Dixon

Detective Dixon assisted Detective Ponzio with the investigation of the shooting. (Detective Dixon T. at 153.) Detective Dixon testified that, on June 29, 2000, he located Robinson in Orlando, Florida and brought him to the local sheriff's office to be interviewed. (Id. at 154-55.) Detective Dixon testified that Robinson told him that he went to Weirfield Street in Brooklyn to pick up Carlos Perez, Regis, Foye, and "another guy." (Id. at 160.) They were driving around looking around for "some guys regarding something that had happened to Lenny" when an argument broke out and the men got out of the car. (Id.) Robinson then told Detective Dixon that after they got out of the car, "[a] black Maxima came through the block and . . . they

6

started shooting." (Id.) Detective Dixon testified that Robinson told him that "[H]e ran. . . . He was scared." (Id.)

     vi.  Testimony of the Remaining Witnesses

  The prosecution also called Officers Mangiaracina and Ainsle, the first responding officers to the scene on the night of the incident, to the stand. (Officer Mangiaracina T. at 27.) Officer Mangiaracina testified that, upon arriving at the scene, he saw a small crowd of people standing around a man who appeared to have been shot but that no one standing near the victim appeared to be especially distraught. (Id. at 31-32.) Officer Ainsle testified that he followed the ambulance to the hospital and was present when Carlos Perez was pronounced dead at 1:22 a.m. (Ainsle T. at 76-77.) Detective Joseph Ramirez, a firearms specialist, testified that both bullets recovered from the Medical Examiner's office appeared to be .38 caliber bullets, but he could not conclude that both bullets were from the same gun. (Ramirez T. at 95-96.) The medical examiner, Dr. Frederic, described the victim's injuries but said she could not conclude anything about the angle from which the bullets entered his body. (T. Frederic at 104-05, 123.)

  B.  *Procedural Background*

  On May 10, 2001, a jury convicted Petitioner of Murder in the Second Degree (N.Y. Penal Law § 125.25(1)). On October 4, 2001, Petitioner was sentenced to a prison term of twenty-five years to life. Robinson appealed his conviction to the New York State Supreme Court, Appellate Division, Second Department. In his direct appeal brief, he claimed that he was deprived of a fair trial because (1) the flight charge given by the trial court was unsupported by the evidence, and (2) the questioning of Foye at trial improperly suggested that the witness had implicated him in prior testimony.

On September 20, 2004, the Appellate Division unanimously affirmed the judgment of conviction. People v. Robinson, 10 A.D.3d 696 (N.Y. App. Div. 2d Dept. 2004). The court found that the flight instruction given by the trial court was supported by evidence and that Petitioner's second contention regarding the questioning of Foye was unpreserved for appellate review and without merit. The New York Court of Appeals denied leave to appeal. People v. Robinson, 825 N.E.2d 143 (N.Y. 2005).

Subsequently, on March 10, 2006, Robinson, through counsel, filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his petition, Robinson claims that the jury instruction regarding flight lacked satisfactory factual predicate and therefore denied him due process under the Fourteenth Amendment to the United States Constitution.

## II. Discussion

*A.    Standard of Review*

The standard of review for habeas corpus petitions filed by state prisoners is set forth in 28 U.S.C. § 2254(d), as amended by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). If Robinson's claims have been fully adjudicated on the merits in state court, habeas relief may not be granted unless the state court's decision:

> (1) was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court's decision is contrary to clearly established federal law as determined by the Supreme Court "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or "if the state court confronts a set of facts that are

8

materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Williams v. Taylor, 529 U.S. 362, 405-06 (2000). Further, a state court decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." Id. at 407.

AEDPA establishes a deferential standard of review: "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. The U.S. Court of Appeals for the Second Circuit has cautioned, however, that while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (citations and quotation marks omitted).

B. *The Flight Charge*

In his petition, Robinson raises only the issue of whether the trial court should have instructed the jury as to his flight. Robinson argues that this charge deprived him of his right to due process and a fair trial under the Fourteenth Amendment. In the alternative, Robinson argues that this court should exercise its discretion to grant an evidentiary hearing to examine further the evidence of Robinson's flight.

Ordinarily, a jury charge in a state trial is a matter of state law and is not reviewable on federal habeas corpus. United States ex rel. Smith v. Montanye, 505 F.2d 1355, 1359 (2d Cir. 1974). To obtain a writ of habeas corpus in federal court on the ground of error in a state court's

instructions to the jury on matters of state law, Petitioner must show both (1) "that the instruction misstated state law" and (2) "that the error violated a right guaranteed to him by federal law." Casillas v. Scully, 769 F.2d 60, 63 (2d Cir. 1985) (citing Cupp v. Naughten, 414 U.S. 141, 146 (1973)).

        1.      Whether the Instruction Misstated State Law

Under New York law, a trial court may give a jury instruction on a defendant's flight where there is evidence of flight and where the jury is "closely instructed as to its weakness as an indication of guilt of the crime charged." People v. Yazum, 196 N.E.2d 263, 264 (N.Y. 1963) (citing People v. Fiorentino, 91 N.E. 195 (N.Y. 1910); People v. Leyra, 134 N.E.2d 475 (N.Y. 1956)); see also People v. Martinez, 298 A.D.2d 897, 899 (N.Y. App. Div. 4th Dept. 2002) (finding that a state court may give a jury instruction on flight where "there was sufficient evidence of flight to warrant a charge on such evidence" and where the court "properly charged the jury that evidence of flight is of slight value and that flight may have an innocent explanation").

        a.      Evidence Warranting a Flight Charge

Regarding the first prong of the Yazum test, 196 N.E.2d at 264, the evidence of flight in the instant case was sufficient to warrant such a jury charge. Under New York law, evidence of flight is admissible as a form of circumstantial evidence of consciousness of guilt. Yazum, 196 N.E.2d at 264. The New York Court of Appeals has set a low bar for the necessary factual predicate required to give a charge on flight to a jury. See id. at 304 (holding that evidence of flight need only be relevant, not necessarily "sufficient," in order for the jury to consider it). "In the absence of explanation, the fact of departure and absence may, in the light of surrounding

circumstances, permit inference of flight and be significant of consciousness of guilt." People v. Dean, 162 A.D.2d 699, 700 (N.Y. App. Div. 2d Dept. 1990) (quoting People v. Stilwell, 155 N.E. 98, 99 (N.Y. 1926)).

Several witnesses testified at Petitioner's trial that he fled from the scene of the crime immediately after the shooting occurred. McDade described his behavior by saying that he "jumped in the car and . . . screeched off." (McDade T. at 50.) Detective Dixon testified that Robinson admitted to the detectives that he left the scene after the shooting. (Detective Dixon T. at 160.) Lawrence Perez testified that, although he interacted with Foye and Regis in the days after the shooting, he did not see Robinson between the time of the shooting and the time when Lawrence Perez moved away from New York. (Lawrence Perez T. at 248.) Detective Ponzio testified that, between February 2000 and April 2000, he attempted to locate Robinson by canvassing Robinson's neighborhood and by performing "computer checks." (Ponzio T. at 138.) Approximately four months after the shooting, the detectives located and arrested Petitioner in Orlando, Florida. (Id. at 138-39).

Furthermore, in affirming the trial court's conviction, the Appellate Division specifically addressed the question of flight: "Contrary to [Robinson's] contention, there was sufficient factual predicate to support a jury instruction on the concept of flight as evidence of consciousness of guilt." People v. Robinson, 10 A.D.3d at 696. Thus, there was sufficient evidence under New York law to warrant the trial court's jury instruction on flight.

        b.       Whether the Trial Court Properly Charged the Jury That Evidence of Flight Has Limited Value

The second prong of Yazum, 196 N.E.2d at 264, was also satisfied because the trial

court's charge properly cautioned the jury that Petitioner's actions may have had an innocent explanation and that evidence of flight has slight value. Even when the evidence supports a jury instruction on flight, the state trial court must instruct the jury that such circumstantial evidence is weak as an indication of guilt of the crime charged. See id., 196 N.E.2d at 264. At Robinson's trial, the judge instructed the jury as follows:

> Now in this case, the People have introduced evidence of certain behavior and conduct by the defendant from which the People contend that the jury may draw an inference that such conduct evidences consciousness of guilt. . . . Your first duty is to decide whether evidence of the defendant's conduct upon which the People rely, if believed by you, does in fact evidence a consciousness of guilt on the part of the defendant. You must examine such evidence carefully. Such conduct may have an innocent explanation. If you find such an explanation from the nature of the conduct itself, you must disregard such evidence totally. Forget you heard it. . . . I instruct you that proof of conduct evidencing consciousness of guilt has slight value. Standing alone, such evidence may never be made a basis for the finding of guilt. However, when the People have introduced other direct and substantial evidence pointing towards guilt of the defendant, then evidence submitted by the People may be considered by you together with such other direct and substantial evidence of guilt, in arriving at your verdict.

(T. at 417-19.) This instruction properly limited the inferences the jury was permitted to draw from such evidence and therefore comported with New York law.

Therefore, given the sufficient factual predicate for the flight instruction and the trial court's balanced instruction regarding the weakness of such evidence, I find that the trial court committed no error under New York law. See Yazum, 196 N.E.2d at 264. Because the trial court did not err under state law in giving this jury charge on flight, this court need not determine whether an error violated a right guaranteed to Petitioner by federal law. See Casillas v. Scully, 769 F.2d at 63.

**III. CONCLUSION**

For the reasons described above, Robinson's petition for a writ of habeas corpus is denied. Because the factual record in the case is sufficient to support the court's decision, Petitioner's request for an evidentiary hearing is denied. A certificate of appealability shall not issue. The Clerk of Court is directed to close the case.


SO ORDERED.

Dated: June 20, 2008                                                  /s Nicholas G. Garaufis
       Brooklyn, New York                              NICHOLAS G. GARAUFIS
                                                                                United States District Judge